# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**AARON CLAUDE SWOVERLAND**
          **Plaintiff,**

      **v.**                               **Case No. 19-C-824**

**ANDREW M. SAUL,**
**Commissioner of the Social Security Administration**
          **Defendant.**

## DECISION AND ORDER

Plaintiff Aaron Swoverland applied for social security disability benefits, claiming that he could no longer work due to a seizure disorder, attention deficit hyperactivity disorder ("ADHD"), and a shoulder impairment, but the Administrative Law Judge ("ALJ") assigned to the case concluded that plaintiff could still perform a significant number of jobs. Plaintiff now seeks judicial review of the ALJ's decision. On review of the record and the submissions, I remand for further proceedings.

## I. FACTS AND BACKGROUND

### A. Medical Evidence

Plaintiff applied for benefits in April 2016, alleging that he became disabled as of January 30, 2016, the date of his first medically established seizure. However, the agency collected his medical records dating back to May 2015, which reflected treatment for ADHD with Adderrall and for insomnia with Ambien. (Tr. at 332-33.) The record further indicates that plaintiff received treatment for substance abuse, including Methadone. (Tr. at 33, 590.)

On September 12, 2015, plaintiff was seen in the emergency room complaining of body

aches and a bruised and swollen tongue.  He denied experiencing a fall, injury, or seizure (Tr. at 366), and doctors were unable to determine the etiology of his symptoms (Tr. at 370-71).

On January 30, 2016, plaintiff went to the emergency room complaining of right shoulder and arm pain, and on examination he was found to have a shoulder dislocation.  (Tr. at 375-76.)  He also complained that his tongue was swollen, and on exam it appeared to have bite marks.  Plaintiff denied having a seizure.  (Tr. at 376.)  An x-ray showed an anterior dislocation of the right shoulder and fracture of the greater tuberosity.  (Tr. at 377.)  A head CT was normal.  (Tr. at 383.)  Dr. Scott Harbick provided pain medication and performed a closed reduction of the right shoulder dislocation.  (Tr. at 377.)  Dr. Harbick concluded that plaintiff likely had seizure, during which he fell and injured his shoulder; he was to follow up with orthopedics and neurology.  (Tr. at 378.)

On February 3, 2016, plaintiff saw Dr. Lisa Kokontis, a neurologist, at the request of Dr. Harbick.  (Tr. at 498.)  Her impression was possible seizure, although it was not witnessed, given the dislocated shoulder and previous history of tongue contusion.  She ordered an MRI and EEG.  At the beginning of the appointment, plaintiff requested Dr. Kokontis refill his narcotics, but she refused, indicating he had to go through his orthopedist or primary doctor.  (Tr. at 499.)

On February 3, 2016, plaintiff also saw orthopedics, complaining of right arm pain.  (Tr. at 404.)  Dr. Joshua Blomberg felt plaintiff's fracture was stable and could be treated in a non-operative manner.  Based on his history of opiate dependence, Methadone use, and non-operative status, Dr. Blomberg did not feel comfortable prescribing narcotics, offering prescription NSAIDs, which plaintiff refused.  (Tr. at 406.)

The evening of February 3, 2016, plaintiff returned to the ER complaining of right arm

2

pain.  He reported running out of Perocet that morning.  (Tr. at 385.)  Doctors provided Perocet and advised plaintiff to follow up with his primary physician.  (Tr. at 389.)

On February 4, 2016, plaintiff followed up regarding his arm injury (Tr. at 327), seen by Kristin Ovadal, PA-C.  It was felt the injury was related to a seizure because of tongue bruising and no recollection of events.  (Tr. at 328-29.)  He complained of right arm and shoulder pain. (Tr. at 329.)  On exam, he had extensive bruising of the upper arm and swelling, but strong grip.  He was assessed with seizure-like activity and closed non-displaced fracture of the right humerus.  He was advised to taper off Adderrall due to a suspected medication related seizure and provided Perocet for pain.  (Tr. at 330.)

On February 17, 2016, plaintiff followed up with orthopedics, reporting his shoulder was significantly improved.  X-rays revealed stable fracture with some interval healing.  Dr. Blomberg strongly recommended plaintiff proceed to physical therapy to learn exercises and work on range of motion.  (Tr. at 408.)

On February 22, 2016, plaintiff returned to PA Ovadal (Tr. at 322), complaining of continued pain in the right arm.  He had not yet started physical therapy.  (Tr. at 323.)  He reported no seizures lately.  On exam, he had normal gait and station, limited shoulder range of motion due to pain, and strong grip.  (Tr. at 324.)  He was scheduled for physical therapy and his pain medications refilled.  He was also to follow up with neurology.  (Tr. at 326.)

A March 28, 2016, MRI of the head revealed no acute infarct, hemorrhage, or mass lesion; and no evidence of mesial temporal sclerosis, cortical dysplasia, or heterotopic gray matter.  (Tr. at 501.)  An EEG was normal during wakefulness and drowsiness.  (Tr. at 505.)

On March 30, 2016, plaintiff followed up with orthopedics, indicating he had gone to physical therapy just once, despite recommendations to do it twice weekly, and kept his

3

shoulder sling in place, despite a recommendation that he discontinue it.  His pain was improved and overall clinically he felt he was doing better.  An x-ray showed the greater tuberosity fracture in stable position with significant interval healing.  (Tr. at 395, 410.)  Dr. Blomberg instructed plaintiff to work hard on range of motion in therapy to avoid persistent stiffness.  (Tr. at 410.)

On April 19, 2016, plaintiff was seen for a possible seizure, reporting that he had been watching YouTube when he suddenly started contracting, making noises, biting his tongue, and breathing hard.  His brother witnessed the seizure, which lasted two to five minutes, and called 911.  Plaintiff remained very confused for another 20 minutes or so.  (Tr. at 434.)  He had stopped taking Adderall in January but continued on Methadone; he was taking Oxycodone every six hours.  (Tr. at 435.)  Dr. Dallas Bogner assessed a seizure and started plaintiff on Keppra.  He was to follow up with Dr. Kokontis.  (Tr. at 436.)  X-rays of the shoulder taken at that time showed healing fracture of the right humeral head.  (Tr. at 440.)  An April 23 drug screen revealed Methadone and Oxycodone, both prescribed, otherwise negative.  (Tr. at 447.)

On April 27, 2016, plaintiff followed up with Dr. Kokontis, who noted that she had not recommended anti-convulsants at the previous evaluation, as it simply was not clear at that time what was going on.  His MRI was unremarkable and the EEG normal.  However, he then had another seizure, which was witnessed by his brother.  He had been started on Keppra by Dr. Bogner, feeling somewhat tired, but otherwise tolerating the medication.  (Tr. at 496.)  Dr. Kokontis continued Keppra at the same dose; he was to call in three weeks if having side effects.  She also provided Lorazepam, which he was to take if he had an aura.  She further provided a prescription for Trazodone at bedtime to ensure proper sleep.  She warned him to stay away from illicit drugs.  They planned on a short neurologic follow up in the next four to

4

six weeks.  (Tr. at 497.)

On May 3, 2016, PA Ovadal completed a seizure questionnaire, indicating that plaintiff was seen in the ER on January 30, 2016, first seen by her on February 4, 2016, last seen on April 19, 2016.  She described plaintiff's seizures as tonic/clonic, lasting two to five minutes, and occurring twice per month.  She further indicated that after a seizure plaintiff felt poor, fearful, tremulous, and confused for up to 20 minutes.  (Tr. at 514.)  He had just started Keppra, so she could not comment on his medication compliance.  He had no history of ethanol related seizures but was on Methadone therapy.  (Tr. at 515.)

On May 26, 2016, plaintiff followed up with Dr. Kokontis, tolerating Keppra much better. He did not think he had any seizures, although he did say there was one time where he noticed that his tongue was "swollen."  This was several weeks ago.  Dr. Kokontis continued Keppra. (Tr. at 521.)

Plaintiff next saw Dr. Konkontis on August 30, 2016, indicating that "on his own" he wanted to know if he "needed" Keppra, so he simply stopped it for about a week.  One night, he noticed that he was having disordered thinking.  He took Lorazepam and felt well again.  He then returned back on his Keppra.  He estimated this was about three weeks ago, and he had not since had any episodes.  Dr. Kokontis emphasized the need for compliance.  Plaintiff reported feeling nauseated after taking Keppra, and Dr. Kokontis offered to switch him to a different medication but he declined, stating the nausea was not that "big of a deal."  (Tr. at 519.)  Dr. Kokontis told plaintiff that he needed to continue the Keppra, that this was lifelong, and that he will need lifelong anti-convulsants given his history and his recent "experimentation" in which he stopped Keppra and had an event.  (Tr. at 519-20.)  Plaintiff understood that stopping his medications could result in a seizure, and that a seizure could be a life threatening

5

event.  (Tr. at 520.)

On September 16, 2016, plaintiff saw PA Ovadal for insomnia and ADHD.  (Tr. at 542-43.)  He reported that he had been off his ADHD medication since the seizure in January and had not been able to get back on it.  His neurologist recently approved him to restart Adderrall on a lower dose and slowly.  His insomnia was stable on Ambien, with no side effects.  (Tr. at 543.)  He reported no seizure activity (or feeling strange like one was coming on) in almost two months.  He only had the feeling one was coming on when he went off his medication for four days and had to use Lorazepam, which got him out of the feeling.  He reported his sleep was OK on Ambien, and he did not report significant impairment with focus and concentration being off Adderrall.  On exam, he had some reduced range of motion and strength of the shoulder.  He was oriented, with adequate memory, and appropriate mood/affect.  (Tr. at 544.)  Ovadal sent a message to neurology about restarting Adderrall, noting that he had been on seizure medication consistently for several weeks, with no seizures in the last few months, so they should be able to start back slowly on the Adderrall.  (Tr. at 545.)

On January 3, 2017, plaintiff followed up with Dr. Kokontis, reporting that for awhile he was doing well but in November and December he had frequent seizures.  "As it turns out, he was not as compliant with his medications as he should have been."  (Tr. at 576.)  When she last spoke with plaintiff in August, Dr. Kokontis told plaintiff that if he missed a dose he needed to take it as soon as he remembered, even if this meant doubling up on his next dose.  He took that to mean he did not have to be as compliant as he needed to be, and there were several days a week when he would only take his medication once per day, with a double dose, resulting in high and then low levels.  (Tr. at 576-77.)  It had been two or three weeks since his last seizure.  He had not had any further dislocations but had a couple episodes where he bit

6

his tongue. Dr. Kokontis again stressed the importance of compliance. (Tr. at 576.) She also wanted to get an ambulatory EEG. If he did not come under better control with medications, he may be a candidate for epilepsy surgery. (Tr. at 577.)

On May 5, 2017, plaintiff saw PA Ovadal for ADHD and insomnia. He reported that he was taking medication as prescribed and was satisfied with the response to the current dose. He was doing well regarding concentration, procrastination, and attentiveness, but forgetfulness remained an issue. Ambien helped his insomnia. He still had frequent seizures, at least weekly, unwitnessed most of the time. (Tr. at 585.) He also reported being depressed over the seizures and not being on disability; he had no income and did not like being a burden on his mother. He got frustrated and then canceled his last appointment with neurology because he felt nothing was helping. (Tr. at 587.) He was see neurology ASAP and continue current medications as it did not seem his seizures were worse on Adderrall. (Tr. at 588.)

On September 6, 2017, plaintiff returned to Dr. Kokontis, having canceled numerous appointments since last seen. He stated that he went through a period where he stopped all his medications. He did not feel like the Keppra was helpful. Specifically, he said that he missed a couple doses and did not have a seizure, but that he could be compliant for a few days and then have a seizure. He estimated that he had two to three seizures per month, all involving alteration of consciousness. Occasionally, he had an aura but if he took Lorazepam he would avoid having a seizure. He reported no headaches, focal neurologic symptoms, or any other concerns or complaints. (Tr. at 573.) Dr. Kokontis increased the Keppra dose and again stressed the importance of compliance. (Tr. at 574.)

On November 13, 2017, plaintiff followed up with Dr. Kokontis, who wrote: "Partial onset epilepsy, normal EEG and MRI scan, but witnessed events. Course is complicated by

noncompliance possibly narcotic abuse, use of methamphetamines. He is on methadone treatment for chronic opioid dependence." (Tr. at 570.) He admitted that he may have missed a dose prior to his Keppra level test. He further stated that he had two episodes when he found himself face planted in his house, unclear how he got there. He also reported that over the past month he had four episodes of vertigo followed by a splitting headache. The vertigo lasted one to two hours, he vomited, his head throbbed, and he had to lay down. (Tr. at 570.) Neurologic exam was normal. (Tr. at 571.) Dr. Kokontis noted that plaintiff's continued seizures on Keppra were concerning, but he did admit to occasional missed doses so noncompliance remained an issue. He thought his seizures were less severe on Keppra: he had not gone to the ER and had no tongue biting or overall muscle soreness. Dr. Kokontis ordered an EEG and MRI and increased Keppra. She suspected the vertigo and headache to be migraine. (Tr. at 572.)

On December 1, 2017, plaintiff saw PA Ovadal for ADHD, reporting that he was taking medication as prescribed but was not satisfied with the response to the current dose. He reported problems with concentration and attentiveness. (Tr. at 580.) He also reported vestibular migraines. He had no seizures the past few weeks, working harder on taking his medications as prescribed. He reported his sleep was OK with Ambien, but his ADHD was not controlled. (Tr. at 582.) Ovadal increased his Adderrall. (Tr. at 583.)

On May 22, 2018, plaintiff's drug counselor wrote a letter, indicating that plaintiff was seen on a weekly basis. He continued to demonstrate abstinence from all illicit and non-prescribed drug use. He also continued to be at a relatively low dose of Methadone. The counselor further stated that he had "noticed that [plaintiff's] functioning level has been altered negatively as a result of the seizures that he had suffered. Although I have not observed

8

[plaintiff] have a seizure, I can tell that he is altered in his functioning and ability to communicate effectively in the aftermath of when he reports seizure activity." (Tr. at 590.)

## B. Procedural History

### 1. Plaintiff's Application and Reports

As indicated, plaintiff applied for benefits in April 2016, alleging a disability onset date of January 30, 2016 (Tr. at 240, 256) based on his right arm/shoulder injury and seizures (Tr. at 260). In a function report, plaintiff indicated that his right arm was essentially just painful dead weight, and that he could not use it to lift, push, pull, or do anything precise. He further reported that he could not drive due to his seizure disorder. (Tr. at 268.) He indicated that he went out a couple times per week, walking or riding in a car, and could go out alone when walking. He further reported that he could handle a savings account and use a checkbook/money order. (Tr. at 271.) He listed hobbies of reading, watching TV, working out, and drawing, the first two every day, the latter two rarely. He noted no problems getting along with family, friends, and neighbors (Tr. at 272), but that he had no more social life (Tr. at 273). He indicated that his impairments affected his ability to lift, reach, talk, remember, concentrate, understand, and use his hands. The physical limitations related to his arm, which was always painful, and the mental limitations were seizure-related, and those would come and go. He reported that he could pay attention for three to five minutes, less on a bad day; followed written instructions fairly well; and followed spoken instructions not nearly as well. (Tr. at 273.) He got along with authority figures "just fine" (Tr at 274), but he did not handle changes in routine well, and his ability to handle stress was fair at best, poor at worst. (Tr. at 274.)

In a seizure questionnaire, plaintiff indicated that he could sometimes predict when an

attack was coming. He took Keppra daily and Lorazepam when he felt an attack may occur. (Tr. at 278.) The attacks lasted a few minutes, up to three, and he experienced tongue biting and frothing at the mouth. After the attacks, he experienced confusion, which could last up to 48 hours. He reported two to four seizures per month. (Tr. at 279.)

### 2. Psychological Evaluation

The agency sent plaintiff for a psychological evaluation, performed by Steve Krawiec, Ph.D., on October 18, 2016. When asked why he had applied for disability, plaintiff stated that in January he suddenly had a lot of pain in his right arm; he went to the ER and x-rays revealed his arm was broken. He also had a swollen tongue, and it was determined that he had a seizure. He indicated he had no recall of the seizure happening. He reported that he still had pain in his arm. Plaintiff indicated that he was on Keppra for control of seizures and took another medication if he felt one coming on. Asked about the frequency of seizures, he said it was hard to say; he last had one about two months ago, and the frequency had decreased with the use of Keppra. He denied other physical health problems. (Tr. at 563.) He indicated that he had restarted Adderall, which had been suspended due to the seizures, and took Zolpidem (Ambien) for sleep. (Tr. at 563-64.) He also went to a Methadone clinic for opiate addiction. He indicated he last used drugs about four years ago. (Tr. at 564.)

Asked about his daily routine, plaintiff indicated that since he could not drive he did not go places unless someone took him. He stated that he did not do much and could not do physical labor like he used to. For instance, the landlord had offered him $200 to help move a tenant out, but he did not do that because of doctors' restrictions regarding what he was to do and not do. As for household chores, he indicated that he helped as much as he could as long as it did not involve any heavy lifting. As for hobbies, he indicated that he did a lot of

10

reading.  He got along with others adequately.  He reported doing construction work prior to the seizures.  (Tr. at 564.)

On mental status exam, plaintiff was oriented, with remote memory and fund of information grossly intact.  On a short-term memory task, he recalled three of three items immediately and two after six minutes.  His attention and concentration ability was adequate for following and participating in the ongoing conversation.  He also did a good job on a serial 2's task but had a mixed performance on arithmetic computations.  He said his mood was fine. (Tr. at 564.)  Asked if he had trouble with anxiety or phobias, he said, "I don't know of anything more than normal people."  (Tr. at 565.)  He did indicate that he did not go out unless accompanied due to concern that he could have a seizure.  Asked how he was at paying attention, staying on task, and focusing, plaintiff said for extended periods of time not so good and for "short bursts excellent." (Tr. at 565.)  Asked what a short burst would involve, he said about 10 minutes.  He indicated that his tendency to finish things was "so-so."  (Tr. at 565.)  He said his organizational skills were not good.  Asked if the Adderrall helped the attention difficulty, he said "that makes a huge difference."  (Tr. at 565.)  He indicated he did not do nearly as well when off Adderrall.  (Tr. at 565.)

Dr. Krawiec also interviewed plaintiff's mother, and she said he was seeking disability due to seizures.  She said that he had awoken her at times saying a seizure was coming and that he wanted her to watch him.  (Tr. at 565.)  She said that plaintiff lived with her, and that he did do household chores and took care of ADL's adequately.  She said he stayed home a lot because he was afraid to go out.  He did go shopping with her and was able to handle finances.  (Tr. at 566.)

Dr. Krawiec concluded:

11

This is an individual, who reported having a seizure condition that apparently is not completely controlled. Given that it clearly sounds as if he would not be suited to return to the type of work that he had done in the past, that being construction. Also a job that required him to [be] on his feet seemingly would not be a good idea because, as he spoke of it, he can have a seizure without any aura, and so could possibly fall if he had a job where he had to be on his feet.

Based on things reported by this individual, I am not inclined to offer a diagnosis of any mental health difficulties such as a mood or anxiety disorder. He did describe ADHD symptoms and is taking a medication that is used to treat that and he said that he is getting some benefit from that.

I believe that this individual has adequate cognitive capacity to understand and carry out simple job instructions. With the use of Adderrall, I think that he probably would be able to carry out simple job instructions as well.

I do not have a reason to think that he would have any trouble getting along with coworkers, supervisors, etc.

Workplace changes and stresses probably would be inadvisable as it might be that such things could make it more likely that he will have a seizure, though I am not convinced that that would be the case.

(Tr. at 566.) Dr. Krawiec diagnosed unspecified attention deficit hyperactivity disorder, with a guarded prognosis (Tr. at 566), indicating that plaintiff would be able to adequately handle his own finances (Tr. at 568).

### 3. Agency Decisions

The agency denied plaintiff's application initially on October 28, 2016, based on the reports of two reviewing consultants. (Tr. at 56, 91.) Janis Byrd, M.D., concluded that plaintiff could perform light work with occasional overhead reaching on the right due to his shoulder injury and no exposure to hazards such as machinery and heights due to his seizure disorder. (Tr. at 61, 64-65.) Kyla King, Psy.D., found no restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining, concentration, persistence, and pace. (Tr. at 62.) Dr. King further found plaintiff moderately

12

limited in the ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Dr. King noted that plaintiff's ADHD responded well to medication, but he may have difficulty coping with stresses and changes. He did not have social interaction limitations. (Tr. at 66.) Finally, she found plaintiff moderately limited in the ability to respond to changes in the work setting. She noted that stresses and changes were inadvisable, as indicated by the consultative examiner. (Tr. at 67.)

Plaintiff requested reconsideration (Tr. at 103), but the agency denied that request on February 16, 2017, based on the opinions of two additional reviewing consultants (Tr. at 70, 106). William Fowler, M.D., found that plaintiff could perform light work, never climbing ladders/ropes/scaffolds and avoiding even moderate exposure to hazards due to the seizure disorder. (Tr at 82-83.) Soumya Palreddy found mild limitation in understanding, remembering or applying information; mild limitation in interacting with others; moderate limitation in concentrating, persisting or maintaining pace; and mild limitation in adapting or managing onself.[1] (Tr. at 80.) Palreddy elaborated that plaintiff was moderately limited in the ability to carry out detailed instructions, maintain attention and concentration for extended periods, and complete a normal workday without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. Regarding social interaction, Palreddy found "no reason to feel he would have problems getting

---

[1]Palreddy's qualifications are not in the record.

13

along w/ workers or supervisors." (Tr. at 85.) Regarding workplace adaptation, Palreddy stated: "Workplace changes and stresses probably would be inadvisable as it might be that such things could make it more likely that he will have a seizure, though I am not convinced that would be the case." (Tr. at 86.) Palreddy concluded: "Despite his mental health issues he remains capable of the basic mental demands of unskilled work on a sustained basis." (Tr. at 80, 86.)

### 4. Hearing Testimony

Plaintiff requested a hearing (Tr. at 117), and on May 23, 2018, he appeared with counsel before an ALJ. He also brought as witnesses his mother and brother, and the ALJ summoned a vocational expert ("VE") to offer testimony on jobs plaintiff might be able to do. (Tr. at 28-29.)

#### a. Plaintiff

Plaintiff testified that he was 30 years old, with a high school education, and last worked in 2007. (Tr. at 32-33.) He indicated that he started using drugs at that time, causing a gap in his work record, but he had been clean since 2013 or 2014. (Tr. at 33-34.) However, he had not worked since then either. (Tr. at 34.)

Plaintiff testified that he suffered from seizures, for which he took Keppra and Lorazepam. (Tr. at 34.) He nevertheless indicated that his seizures were not under control, as he still had one three times a month. (Tr. at 34.) He said that two different things happened when he had a seizure. In the minority of cases, he would have an aura, feeling a seizure coming on, so he would take Lorazepam, lay down, and have someone watch him; he would not actually have a seizure if he could get it under control in time. More often, he would not feel

14

the seizure coming on, and he would later find his tongue swollen and his brain hazy and realize he had a seizure; he would not realize he was having a seizure while it was actually happening. He testified that, on average, he had three seizures per month. (Tr. at 35.) He did not usually go the hospital after a seizure, unless he hurt himself. Sometimes, during a seizure he would slump and fall to the floor. He testified that he began having seizures about three years ago. (Tr. at 36.) During one of his seizures, he dislocated his shoulder, requiring treatment in the emergency room. He indicated that his shoulder subsequently healed after he completed physical therapy. (Tr. at 37.)

Plaintiff's doctors told him the seizures lasted a couple minutes, but he testified that it took him a couple days to fully recover. He indicated that since the seizures started he never went anywhere by himself. (Tr. at 38.) On days when he felt an aura, which happened three or four times a month, he would lay in bed all day and do nothing. He would experience fatigue, confusion, and lack of focus. (Tr. at 39.)

Plaintiff admitted that for a time he was non-compliant with his medications. (Tr. at 39.) He explained that when he realized this would be a lifelong problem, he became depressed and frustrated, being a burden on his family, and he stopped taking his medication and canceled his doctor appointments. He testified that he was now back on track, taking his medication as directed. (Tr. at 40.) Plaintiff also testified that he had ADHD, which caused lack of focus, trouble finishing tasks, and easy distraction. (Tr. at 40.)

### b. Plaintiff's Mother

Plaintiff's mother testified that she had never seen her son have a seizure. (Tr. at 42.) However, she had observed the residual effects, indicating that after a seizure he got confused, had trouble concentrating, and appeared shaky and sweaty. She testified that she observed

this a couple times, maybe twice, over the past few months.  It could take him all day to recover after a seizure.  (Tr. at 43.)  She further testified that there had been times when plaintiff felt a seizure coming on and asked her to watch him.  He did not socialize or go out alone.  (Tr. at 44.)

### c.    Plaintiff's Brother

Plaintiff's brother testified that he observed plaintiff have a seizure in 2016.  On that occasion, plaintiff had come over to his house, they were watching TV, and all of a sudden he started making noises, biting his tongue, and violently shaking.  He shook himself off the couch, and his brother called paramedics.  The seizure itself lasted about three minutes, and plaintiff was unable to speak and seemed very confused for about ½ hour afterwards.  (Tr. at 46.) Plaintiff's brother had not seen any seizures since then.  However, a couple times per month plaintiff would complain of an aura.  (Tr. at 47.)  Plaintiff did not go out alone; his brother often drove him.  Plaintiff's brother indicated that since January 2018 plaintiff had reported auras about twice a month.  (Tr. at 48.)

### d.    VE

The ALJ asked the VE a hypothetical question, assuming a person of plaintiff's age and education, capable of medium work, unable to work at unprotected heights or with moving mechanical parts, must avoid all workplace hazards, cannot operate motor vehicles, was limited to simple routine tasks but not at production pace, could tolerate occasional changes to a routine work setting, and would be off task 5% of the workday.  (Tr. at 52.)  The VE testified that such a person could work as an inspector, cleaner, or packager.  (Tr. at 52-53.) Assuming that the person would be off task 15% of the workday or be absent twice per month

would preclude competitive employment.  (Tr. at 53.)  The VE further explained that a person could not sit or stand at will in medium work, but that there would be light and sedentary jobs that allow for changes of position every 30 minutes.  (Tr. at 53-54.)  The unskilled jobs contemplated by the hypothetical would not allow for additional breaks.  (Tr. at 54.)

### 5.    ALJ's Decision

On July 24, 2018, the ALJ issued an unfavorable decision.  (Tr. at 10.)  Following the familiar five-step evaluation process, see 20 C.F.R. § 416.920(a)(4), the ALJ concluded at step one that plaintiff had not engaged in substantial gainful activity since April 18, 2016, the application date.  (Tr. at 15.)

At step two, the ALJ found that plaintiff had the severe impairments of seizure disorder, substance abuse disorder, and ADHD.  The ALJ noted that plaintiff treated for a shoulder fracture, but the medical records and testimony showed that this impairment healed after he went through physical therapy, and the record contained no medical opinions that credibly and consistently indicated this impairment caused any significant functional limitations.  (Tr. at 16.)

At step three, the ALJ found that plaintiff's impairments did not meet or equal a Listing Specifically, the ALJ evaluated plaintiff's mental impairments under Listing 12.02, which is met if the claimant has one "extreme" or two "marked" limitations under the so-called "paragraph B" criteria.[2]  (Tr. at 16.)  The ALJ found mild limitation in understanding, remembering, or

---

[2]Prior to January 2017, the paragraph B criteria were (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation.  See Charles M. v. Saul, No. 18 C 6949, 2020 U.S. Dist. LEXIS 6573, at *10 n.5 (N.D. Ill. Jan. 15, 2020).  The new criteria, which the ALJ applied here, are (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting or managing oneself.  As I have previously indicated, "I see no indication that these changes impact the Seventh Circuit's CPP case-law."  Miller v. Saul, No. 19-C-305, 2020 U.S. Dist. LEXIS 39491, at *19 n.1 (E.D.

applying information (Tr. at 16-17); mild limitation in interacting with others; moderate limitation in concentrating, persisting, or maintaining pace ("CPP"); and mild limitation in adapting or managing oneself (Tr. at 17). Regarding CPP, the ALJ wrote:

> The claimant stated in his function report that he can only pay attention for approximately 3-5 minutes at a time, and less on a bad day (Exhibit 3E at 6). Additionally, he stated that he is not able to follow spoken instructions well (Exhibit 3E at 6). Despite this, the claimant also stated that he is able to handle a savings account and use a checkbook/money order (Exhibit 3E at 4). Accordingly, the undersigned finds that the claimant has a moderate limitation in this area of functioning.

(Tr. at 17.)

Prior to step four, the ALJ determined that plaintiff had the residual functional capacity ("RFC") to perform medium work, except that he had to avoid unprotected heights or workplace hazards, could not operate motor vehicles, was limited to simple routine tasks (but not at production pace), could tolerate occasional changes to a routine work environment, and would be off task 5% of the workday. In making this finding, the ALJ considered plaintiff's alleged symptoms and the medical opinion evidence. (Tr. at 18.)

Regarding the symptoms, the ALJ acknowledged the required two-step process, under which she had to first determine whether plaintiff had an underlying medically determinable impairment that could reasonably be expected to produce the symptoms. Second, once such an impairment had been shown, she had to evaluate the intensity, persistence, and limiting effects of the symptoms. For this purpose, if the symptoms were not substantiated by objective medical evidence, the ALJ had to consider the other evidence in the record to determine if the symptoms limited plaintiff's ability to do work-related activities. (Tr. at 18.)

─────────────────────

Wis. Mar. 4, 2020).

Plaintiff alleged disability due to symptoms related to his right arm/shoulder injury and seizures.  He reported that his symptoms caused significant difficulty with activities of daily living, particularly lifting, reaching, talking, remembering, concentrating, understanding, and using his hands.  (Tr. at 18.)

The ALJ reviewed the medical evidence, which indicated that in early 2016 plaintiff experienced arm and shoulder pain.  He went to the emergency room in January, and doctors determined that he had a right shoulder dislocation, closed fracture of the right proximal humerus, and a possible seizure.  He subsequently made several visits complaining of pain, receiving medication and with imaging showing that his arm and shoulder were healing correctly.  An MRI of the head in March showed no evidence of acute infarction, no significant intra-cranial hemorrhage or mass lesion, and an EEG was normal during wakefulness and drowsiness.  (Tr. at 18.)  In April, plaintiff was seen for a possible seizure, reporting that while watching a video he suddenly started contracting and making noises.  (Tr. at 18-19.)  He was assessed with a seizure and started on Keppra.  (Tr. at 19.)

In May 2016, plaintiff filled out a seizure questionnaire stating that he experienced tonic/clonic seizures about twice per month lasting two to five minutes.[3]  In late May, plaintiff stated that he had no seizures since his last appointment, which suggested that the treatment was working.  In August, doctors noted that plaintiff had partial onset epilepsy syndrome but that he had not had any seizures while on his medications.  In September, during a medication check, the provider noted that plaintiff had been off his ADHD medication since his seizure but that recently his neurologist said he could restart at a lower dose.  During an October

---

[3]It appears that PA Ovadal filled out this questionnaire, not plaintiff.  (Tr. at 514-15.)

consultative exam, plaintiff described ADHD symptoms but stated that he was taking medication and getting some benefit from it. (Tr. at 19.)

In September 2017, plaintiff saw his neurologist, who noted that plaintiff had canceled several appointments since last seen. He had also stopped taking his medication and was having two to three seizures per month. At a November appointment, the doctor noted that plaintiff's condition was complicated by non-compliance and possible narcotic abuse, specifically methamphetamine. The doctor further noted that plaintiff was on Methadone for chronic opioid dependence. At a December medication check, the examiner noted that plaintiff's attention and concentration remained an issue, despite him taking ADHD medications as prescribed. (Tr. at 19.)

The ALJ stated:

Overall, the claimant's treatment records, including the objective medical evidence, are not entirely consistent with the claimant's medically determinable impairments and subjective reports of disabling symptoms. However, the medical evidence shows that the claimant experiences symptoms that cause work-related functional limitations. Specifically, the evidence of record indicates that, despite treatment, the claimant has functional limitations due to mental health impairments and that the claimant retains the functional abilities to perform exertionally medium work with some environmental and mental limitations, as reflected in the residual functional capacity statement outlined above. In particular, the claimant continues to experience seizures when he is not compliant with his medications and his substance abuse has caused complications with this issue as well.

(Tr. at 19.)

The ALJ next discussed the opinion evidence. The agency medical consultants concluded that plaintiff could perform light work with some postural and environmental limitations. The ALJ gave their opinions only "some weight" as a limitation to light work was not supported by the record. Plaintiff testified that his shoulder and arm issues resolved after he

20

went to physical therapy, and imaging showed that the injury was healing.  (Tr. at 19.)

The ALJ also gave some weight to the assessment of Dr. King, the state agency psychological consultant at the initial level, who concluded that plaintiff had adequate capacity to understand and carry out simple instructions, may have difficulty coping with stresses and changes, had no social interaction limitations, but stresses and changes were inadvisable.  The ALJ found that mild limitations in social interaction and managing himself were appropriate due to plaintiff's ADHD and seizures, as well as his testimony that he did not socialize or go anywhere by himself.  (Tr. at 20.)

The also gave some weight to the assessment of Soumya Palreddy, the psychological consultant at the reconsideration level, who concluded that plaintiff did not have a limitation in understanding and remembering, had a moderate limitation in concentration and persistence, did not have a limitation in social interaction, and had a mild limitation in the ability to handle stress and changes at the job.  Plaintiff's self-reported issues with understanding and memory supported a mild limitation in understanding and remembering, and a mild limitation in social interaction was supported by plaintiff's testimony that he did not socialize or go anywhere by himself.  (Tr. at 20.)

Finally, the ALJ considered the statements of Dr. Krawiec, the psychological consultative examiner, that plaintiff had adequate cognitive capacity to understand and carry out simple job instructions, and with the use of Adderrall would probably be able to carry out simple job instructions; that he would not have trouble getting along with coworkers and supervisors; and that workplace changes and stresses would be inadvisable.  The ALJ gave "this opinion significant weight based on exam findings and the fact that it is consistent with the overall evidence in the record."  (Tr. at 20.)

21

As for plaintiff's statements, the ALJ found that while plaintiff's impairments could reasonably be expected to cause the alleged symptoms, plaintiff's "statements concerning the intensity, persistence, and limiting effects of the symptoms are not entirely consistent with the medical evidence of record." (Tr. at 20.) The ALJ gave several reasons for this conclusion.

First, the ALJ found that plaintiff's treatment records did not support his allegations of severe functional limitations. Rather, the evidence showed that his impairments were generally mild to moderate in nature. Providers offered conservative treatment, which generally appeared to control his symptoms, and there were no consistent indications from any of his providers that they felt plaintiff had serious ongoing functional deficits. Plaintiff testified that his shoulder and arm injury healed after he went to physical therapy, and the record supported no lingering limitations from this injury. Despite this, the ALJ found that plaintiff was limited to a range of medium work due to his history of seizures. (Tr. at 20.)

Second, the ALJ found that the medical opinion evidence failed to validate most of plaintiff's allegations of impairment. Rather, the medical opinion evidence that was consistent with the record indicated that plaintiff was capable of medium work with some environmental, mental, and social limitations. (Tr. at 21.)

Third, the ALJ found that plaintiff's own statements and behavior undermined his allegations of limitation. Plaintiff alleged and testified that he experienced frequent and severe seizures, but plaintiff had been non-compliant with his medications. Nevertheless, the medical records did not reflect the frequency and intensity of seizures occurring as plaintiff testified; further, EEG and MRI tests had been normal. Finally, recent records indicated that plaintiff used drugs; plaintiff testified that he had been clean since 2013/2014, but a treatment note from November 2017, as well as a letter from a treating source, stated that he is still being

22

treated for chronic opioid dependence.  (Tr. at 21.)

The ALJ concluded:

The evidence as a whole indicates that the claimant does experience symptoms and limitations caused by severe impairments; however, the record does not indicate that the claimant has limitations beyond those identified in the residual functional capacity statement.  Even after giving the claimant the benefit of reasonable doubt and crediting the testimony to the extent that it is consistent with the medical evidence, the claimant's extreme allegations regarding functional limitations are simply not supported by the evidence as a whole. Despite these allegations, the record lacks any evidence that the claimant is so significantly limited, which suggests that the reported limitations are not as severe as the claimant alleges.  All of these factors discount the claimant's allegations of limitation and support the limitations identified in the residual functional capacity statement.

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments can reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record, for the reasons explained in this decision.  The residual functional capacity reflects environmental limitations needed due to seizures and mental limitations due to ADHD.  Accordingly, the undersigned finds that the claimant is capable of the above stated residual functional capacity.

(Tr. at 21.)

At step four, the ALJ determined that while plaintiff had some past work, he did not perform any of these jobs at the substantial gainful activity level.  She therefore found that he did not have any past relevant work.  (Tr. at 21.)

Finally, at step five, the ALJ concluded that plaintiff could perform jobs existing in significant numbers, as identified by the VE, including inspector, cleaner, and packager.  (Tr. at 22.)  The ALJ accordingly found plaintiff not disabled.  (Tr. at 23.)

On April 3, 2019, the Appeals Council denied review of the ALJ's decision (Tr. at 1), making the ALJ's decision the final word from the Commissioner of Social Security.  See Prater

v. Saul, 947 F.3d 479, 481 (7th Cir. 2020).  This action followed.

## II. STANDARD OF REVIEW

In reviewing a social security appeal, the court will "reverse only if the ALJ based the denial of benefits on incorrect legal standards or less than substantial evidence."  Martin v. Saul, 950 F.3d 369, 373 (7th Cir. 2020).  "Substantial evidence is not a demanding requirement. It means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Id. (quoting Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019)).  The court may not, under this deferential standard, re-weigh the evidence, resolve conflicts, decide questions of credibility, or otherwise substitute its judgment for that of the ALJ.  L.D.R. v. Berryhill, 920 F.3d 1146, 1152 (7th Cir.), cert. denied, 140 S. Ct. 378 (2019).  Nevertheless, the court must conduct a critical review of the record before affirming the ALJ's decision; the decision cannot stand if it lacks evidentiary support, an adequate discussion of the issues, or an accurate and logical bridge from the evidence to the conclusions.  Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003).

## III.  DISCUSSION

**A.    RFC**

Plaintiff argues that the ALJ erred in two respects in determining RFC.  I agree on the first point (see Pl.'s Br. at 11-14), but not the second (see Pl.'s Br. at 14-16).

**1.    CPP**

The Seventh Circuit has held that both the hypothetical question posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record, including even moderate limitations in CPP.  Crump v. Saul, 932 F.3d 567, 570

(7th Cir. 2019).  While the ALJ need not put the questions to the VE in specific terms—there is no "magic words" requirement—she must ensure that the VE is apprised fully of the claimant's limitations so that the VE can exclude those jobs that the claimant would be unable to perform. Id.  "The best way to do that is by including the specific limitations—like CPP—in the hypothetical."  Id.  "When the ALJ supplies a deficient basis for the VE to evaluate the claimant's impairments, this error necessarily calls into doubt the VE's ensuing assessment of available jobs."  Id.

Here, the ALJ found at step three that plaintiff had a moderate limitation in CPP.  (Tr. at 17.)  Then, in determining RFC, she limited plaintiff to simple routine tasks, but not at production pace, and occasional changes to a routine work environment.  (Tr. at 18.)  The Seventh Circuit has found such formulations deficient.  See, e.g., Crump, 932 F.3d at 569-70 (finding that RFC for "simple, routine, repetitive tasks with few workplace changes" failed to account for moderate limitations in CPP); DeCamp v. Berryhill, 916 F.3d 671, 675-76 (7th Cir. 2019) ("We have previously rejected similar formulations of a claimant's limitations because there is no basis to suggest that eliminating jobs with strict production quotas or a fast pace may serve as a proxy for including a moderate limitation on concentration, persistence, and pace."); Varga v. Colvin, 794 F.3d 809, 815 (7th Cir. 2015) (finding that undefined restriction from "fast paced production" made it impossible for the VE to assess whether a person with the claimant's limitations could maintain the pace proposed, and that a limitation on workplace changes dealt largely with workplace adaptation rather than CPP).

The Commissioner notes that consultant Palreddy found plaintiff capable of "unskilled work on a sustained basis" (Def.'s Br. at 10, citing Tr. at 86), and that an ALJ may rely on a "medical expert who effectively translated an opinion regarding the claimant's mental limitations

into an RFC assessment." (Def.'s Br. at 10, citing <u>Milliken v. Astrue</u>, 397 Fed. Appx. 218, 221 (7th Cir. 2010).)  The ALJ gave only "some weight" to the psychological consultants here, and she did not specifically cite the narrative portion upon which the Commissioner now relies.[4]

More importantly, the Seventh Circuit has clarified that "even if an ALJ may rely on a narrative explanation, the ALJ still must adequately account for limitations identified elsewhere in the record, including specific questions raised in check-box sections of standardized forms such as the PRT and MRFC forms."  <u>DeCamp</u>, 916 F.3d at 676.  Here, both psychological consultants found moderate limitations in CPP (Tr. at 62, 80), as did the ALJ in her step three analysis (Tr. at 17).  In further explaining their CPP findings, the consultants found plaintiff moderately limited in the ability to maintain attention and concentration for extended periods, complete a normal workday without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  (Tr. at 66, 85.)  However, none of these limitations were referenced in the hypothetical and RFC. <u>See id.</u> at 675 (reversing where the consultant found moderate limitations in maintaining attention and concentration for extended periods; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; working in coordination or proximity to others without being distracted; and completing a normal workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace).

The other cases the Commissioner cites are distinguishable.  (Def.'s Br. at 10-11.)  In <u>Saunders v. Saul</u>, 777 Fed. Appx. 821, 825 (7th Cir. 2019), the ALJ relied on a testifying

---

[4]To the extent she did not fully credit the psychological consultants, it appears the ALJ found plaintiff more limited than they had opined.  (Tr. at 20.)

medical expert to assess the claimant's limitations, "and she appropriately included in her hypothetical question to the VE all of the doctor's proposed limitations that she found to be supported by the record." No such expert testified in this case. Similarly, in Burmester v. Berryhill, 920 F.3d 507, 511 (7th Cir. 2019), the ALJ adopted the opinion of a consulting examiner, who opined that the claimant could maintain concentration and attention for work. The examiner's report contained no further list of moderate difficulties, unlike the consultants' reports in DeCamp and in the present case.[5] See id. at 511-12 (distinguishing DeCamp, 916 F.3d at 675-76).

In Jozefyk v. Berryhill, 923 F.3d 492, 498 (7th Cir. 2019), the ALJ failed to specifically include the claimant's moderate CPP limitation in the RFC, but the court found no reversible error because the medical evidence showed that the claimant's "impairments surface only when he is with other people or in a crowd." Similarly, in Dudley v. Berryhill, 773 Fed. Appx. 838, 842 (7th Cir. 2019), the court noted that "Dudley's greatest limitations are stress- and panic-related" and found that the ALJ's detailed RFC adequately addressed them. There is no indication in the present case that plaintiff's CPP limitations are similarly context specific.

The ALJ also found that plaintiff would be off task 5% of the workday. (Tr. at 18.) To the extent the ALJ may have intended this to account for plaintiff's CPP deficiencies, see Crump, 932 F.3d at 570, she failed to explain the basis for the percentage. At the hearing, the ALJ asked the VE two questions incorporating time off task; the VE responded that 5% would permit performance of jobs (Tr. at 52), while 15% would not (Tr. at 53). Without explanation, the ALJ incorporated the 5% figure into the RFC. See Lanigan v. Berryhill, 865 F.3d 558, 563

_____

[5]The ALJ also relied on Dr. Krawiec's report, but the Commissioner primarily relies on Palreddy's narrative explanation in responding to this argument. (Def.'s Br. at 10-11.)

(7th Cir. 2017) (reversing where ALJ failed to build a logical bridge from the evidence to his conclusion that the claimant would be off task no more than 10% of the time).

The Commissioner responds that any error was harmless because plaintiff points to no evidence that he would be off task more than 5% of the time.  (Def.'s Br. at 12.)  However, the record does contain evidence that plaintiff had difficulty focusing, concentrating, and finishing tasks due to his ADHD (Tr. at 40, 565), in addition to the residual effects of his seizures (Tr. at 35, 38-39, 514).  The ALJ is not required to accept these claims, but she should provide some explanation for her time off task finding.

**2.    Function-by-Function**

Plaintiff also complains that in determining RFC the ALJ failed to assess his abilities on a function-by-function basis, as required by SSR 96-8p.  (Pl.'s Br. at 14.)  The Seventh Circuit recently joined other circuits "in concluding that a decision lacking a seven-part function-by-function written account of the claimant's exertional capacity does not necessarily require remand."  Jeske v. Saul, No. 19-1870, 2020 U.S. App. LEXIS 10392, at *31 (7th Cir. Apr. 2, 2020).  So long as the court is able to determine that the ALJ considered the claimant's ability to perform all seven functions, it need not remand for explicit findings.  Id. at *31-32.

Here, plaintiff develops no argument that the ALJ failed to consider any particular function or any related line of evidence; rather, he claims per se error.  (Pl.'s Br. at 14-16, Pl.'s Rep. Br. at 5-9.)  That argument fails under Jeske.

**B.    Credibility**

Plaintiff also challenges the ALJ's credibility finding.  In evaluating the credibility of a claimant's statements regarding his symptoms, the ALJ must first determine whether the

claimant suffers from a medically determinable impairment that could reasonably be expected to produce the alleged symptoms.  SSR 16-3p, 2016 SSR LEXIS 4, at *5.  Second, if the claimant has such an impairment, the ALJ must evaluate the intensity and persistence of the symptoms to determine the extent to which they limit the claimant's ability to work.  Id. at *9. If the statements are not substantiated by objective medical evidence, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms based on the entire record and considering a variety of factors, including the claimant's daily activities; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the claimant takes; treatment, other than medication, the claimant receives or has received for relief of the symptoms; any measures other than treatment the claimant uses or has used; and any other factors concerning the claimant's functional limitations and restrictions due to the symptoms.  Id. at *18-19.

On review, the court will reverse an ALJ's credibility finding only if it is "patently wrong." Ray v. Berryhill, 915 F.3d 486, 490 (7th Cir. 2019).  While this standard is highly deferential, the ALJ "still must competently explain an adverse-credibility finding with specific reasons supported by the record." Engstrand v. Colvin, 788 F.3d 655, 660 (7th Cir. 2015) (internal quote marks omitted); see also Cullinan v. Berryhill, 878 F.3d 598, 603 (7th Cir. 2017) ("A credibility determination lacks support when it relies on inferences that are not logically based on specific findings and evidence.").

Here, the ALJ found that plaintiff's impairments could reasonably be expected to cause the symptoms he alleged, but that his statements regarding the intensity, persistence, and limiting effects of the symptoms were "not entirely consistent" with the evidence of record.  (Tr. at 20, 21.)  She gave several reasons for this conclusion: (1) the treatment records did not

support plaintiff's allegations of severe functional limitations, as he received conservative treatment which generally appeared to control his symptoms; (2) the medical opinion evidence failed to validate most of plaintiff's allegations of impairment; and (3) plaintiff's own statements and behavior, including his non-compliance with treatment and possible illicit drug use, undermined his allegations.  (Tr. at 20-21.)

Plaintiff starts by arguing that remand is required because the ALJ relied on the kind of "meaningless boilerplate" condemned by the Seventh Circuit in finding his statements "not entirely consistent" with the record.  (Pl.'s Br. at 16, citing Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012).)  The use of boilerplate is innocuous when the language is followed by specific reasons for discounting the claimant's testimony.  Schomas v. Colvin, 732 F.3d 702, 708 (7th Cir. 2013) (citing Pepper v. Colvin, 712 F.3d 351, 367-68 (7th Cir. 2013); Filus v. Astrue, 694 F.3d 863, 868 (7th Cir. 2012)).  Here, the ALJ gave several reasons for doubting plaintiff's credibility, as plaintiff acknowledges on the next page of his brief.  (Pl.'s Br. at 17; see also Pl.'s Rep. Br. at 9.)

Plaintiff argues that the reasons provided are legally incorrect and lack the support of substantial evidence.  Plaintiff first contends that, contrary to the ALJ's suggestion, his seizures were not controlled; even when compliant with medications he experienced one or two seizures a month, which were triggered with any significant exertion and kept him from driving or leaving his home unaccompanied.  (Pl.'s Br. at 17, citing Tr. at 35-36, 38-39, 44,46-49, 272, 278-279, 293, 298, 303, 328, 366, 370, 378, 385, 434, 570, 573, 575-576, 585,  587.)

The ALJ's first reason encompassed not just the seizure disorder but also plaintiff's shoulder problem and ADHD.  As the ALJ noted, plaintiff appeared to recover from the shoulder injury (Tr. at 16, 20, 37), and he admitted benefitting from his ADHD medication (Tr.

at 19, 565).  See Simila v. Astrue, 573 F.3d 503, 519 (7th Cir. 2009) (noting that while an ALJ cannot deny disability solely because the objective medical evidence does not substantiate the claimant's statements, the ALJ may consider the claimant's treatment history).

Further, the ALJ cited treatment notes from May and August 2017 suggesting fewer seizures when plaintiff complied with his anti-convulsant medication.  (Tr. at 19; Tr. at 521 – noting no seizures in the past month; Tr. at 519 – noting no seizures in three weeks since resuming Keppra, and that plaintiff took Lorazepam when he last noticed one coming on and felt well again.)  While plaintiff claimed in his testimony and reports that the seizures were not under control (Tr. at 34, 35-36, 278-79, 293, 298, 303), such "subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."  Arnold v. Barnhart, 473 F.3d 816, 823 (7th 2007).

Plaintiff cites a number of treatment notes, but several of them pre-date his prescription for Keppra (Tr. at 328, 366, 370, 378, 385, 434), which was started in April 2016 (Tr. at 436), and thus provide no support for his argument.  The later notes record continued episodes after he started on Keppra but also document his non-compliance.  For instance, during his November 13, 2017 visit with Dr. Kokontis, plaintiff reported two episodes, and Dr. Kokontis did note that "his continued seizures on keppra are concerning."  (Tr. at 572.)  However, she further wrote that "he does admit to occasional missed doses, so noncompliance continues to be an issue although is better."  (Tr. at 572.)  On September 6, 2017, plaintiff reported two to three seizures per month but also admitted that "he went through a period where he stopped all his medications."  (Tr. at 573.)  On January 3, 2017, Dr. Kokontis noted plaintiff was doing fairly well on Keppra before having more frequent seizures in November and December.  "As it turns out, he was not as compliant with his medications as he should have been."  (Tr. at 575-76.)

31

The ALJ specifically discussed the September and November 2017 records (Tr. at 19), and it was not unreasonable for her to note that medication non-compliance was a precipitating/aggravating factor in his seizures and to note his non-compliance when considering his allegations of frequent and severe seizures (Tr. at 21).  See Whetzel v. Astrue, No. 1:07-CV-210-TS, 2009 U.S. Dist. LEXIS 19377, at *6-7 (N.D. Ind. Mar. 4, 2009) (upholding adverse credibility finding based in part on non-compliance with seizure medication); see also Skinner v. Astrue, 478 F.3d 836, 845 (7th Cir. 2007) ("Contrary to any claim of severity, the ALJ concluded that at best Skinner had demonstrated non-disabling symptoms, and the record medical evidence established that those symptoms are largely controlled with proper medication and treatment.").

The ALJ did not cite the notes from plaintiff's May 2017 visit with PA Ovadal, at which he reported weekly seizures.  (Tr. at 585, 587.)  However, this was during the period when plaintiff had canceled his neurology appointments (Tr. at 587) and "stopped all his medications" (Tr. at 573).  Ovadal advised him to "[s]ee neurology back again ASAP."  (Tr. at 588.)  The ALJ need not discuss every piece of evidence in the record, e.g., Pepper, 712 F.3d at 362, and given the records the ALJ cited it is hard to see how her finding that plaintiff benefitted from treatment is "patently wrong."

Plaintiff also takes aim at the ALJ's second reason, claiming that it is conclusory, and that the ALJ failed to cite any medical evidence or opinion that he could do medium work.  (Pl.'s Br. at 18.)  However, it was plaintiff's burden to show he was disabled, not the ALJ's, see Summers v. Berryhill, 864 F.3d 523, 527 (7th Cir. 2017), and plaintiff failed to present any

medical opinion supporting his claim of disabling symptoms.[6] Further, as the ALJ indicated

elsewhere in her decision, see Curvin v. Colvin, 778 F.3d 645, 650 (7th Cir. 2015) (noting that

the court reads the ALJ's decision as a whole to ascertain whether she considered all of the

relevant evidence, made the required determinations, and gave supporting reasons for her

decisions), the ALJ gave partial weight to the agency medical consultants, who found plaintiff

capable of light work with additional environmental limitations.  The ALJ agreed that plaintiff

needed to avoid heights and hazards (Tr. at 18), but discounted the limitation to light work

based on plaintiff's shoulder/arm injury, noting that by the time of the hearing plaintiff's arm had

healed, and no treating provider assessed ongoing limitations (Tr. at 19).

Relying on the same string cite from the record, plaintiff argues that the evidence does

not even support a sedentary RFC because he spends much of the day sitting or lying down

and never drives or goes out alone.  (Pl.'s Br. at 18, citing Tr. at 35-36, 38-39, 44,46-49, 272,

278-279, 293, 298, 303, 328, 366, 370, 378, 385, 434, 570, 573, 575-576, 585, 587.)  While

plaintiff testified that he would lay in bed three or four days per month (Tr. at 38-39) and

_____

[6]Plaintiff notes Dr. Krawiec's statements that he would not be suited to return to his past construction work, and that it "seemingly would not be a good idea" for plaintiff to work a job that "that required him being on his feet" because he "could possibly fall" during a seizure. (Tr. at 566; Pl.'s Br. at 17.)  These statements were based on plaintiff's subjective reports, which the ALJ did not fully accept.  Moreover, the agency tasked Dr. Krawiec with evaluating plaintiff's mental functioning, not his seizure disorder or exertional ability, and plaintiff develops no argument that the ALJ erred in considering Dr. Krawiec's report.  Plaintiff contends that the record contains no support for medium work, as even the agency medical consultants limited him to light work. (Pl.'s Br. at 17-18.) In determining RFC, the ALJ considers the entire record and "is not required to rely entirely on a particular physician's opinion." Schmidt v. Astrue, 496 F.3d 833, 845 (7th Cir. 2007).  Here, the ALJ explained that he gave only some weight to the medical consultants because their limitation to light work appeared to be based on plaintiff' right shoulder/arm problem, which had resolved by the time of the hearing.  (Tr. at 19.)  While it is true that no medical source affirmatively said plaintiff could perform medium work, that does not require remand.  See Vang v. Saul, No. 19-1860, 2020 U.S. App. LEXIS 5342, at *8-9 (7th Cir. Feb. 21, 2020) (rejecting a similar argument).

reported that he limited activities due to fatigue (Tr. at 293), he points to no specific medical evidence supporting a limitation to sedentary work. His doctors did tell him not to drive (e.g., Tr. at 522, 525, 573), but the ALJ found he "cannot operate motor vehicles" (Tr. at 18).

Plaintiff's challenge to the ALJ's third reason gains more traction. The ALJ failed to consider the reasons for plaintiff's non-compliance, e.g., that he became depressed and frustrated, being a burden on his family, so he stopped taking his medications and canceled his doctor appointments. (Pl.'s Br. at 19; Tr. at 39-40, 573, 587.) "[T]he ALJ was required by Social Security Rulings to consider explanations for instances where [plaintiff] did not keep up with [his] treatment, and [she] did not do so." Myles v. Astrue, 582 F.3d 672, 677 (7th Cir. 2009).

The ALJ's suspicion of drug use was also problematic. The ALJ cited two pieces of evidence on this issue. (Tr. at 21.) First, she referenced a November 2017 treatment note, presumably Dr. Kokontis's November 13, 2017 record, which states: "Course is complicated by noncompliance possibly narcotic abuse, use of methamphetamine. He is on methadone treatment for chronic opioid dependence." (Tr. at 570.) It is unclear why Dr. Kokontis may have suspected narcotic abuse at that time. As far as I can tell, the record contains no drug test positive for illicit substances. (See Tr. at 447, 578.) At plaintiff's September 6, 2017, appointment, Dr. Kokontis wrote: "Complicating issues as [sic] methadone dependence, ADHD requiring amphetamine use as well, noncompliance as described above." (Tr. at 573.)[7] This appears to be a reference to plaintiff's use of Adderrall, which contains a "combination of

_____

[7]Confusingly, this note also states that "witnessed events course is complicated by noncompliance possibly narcotic abuse, use of methamphetamines." (Tr. at 574.)

dextroamphetamine and amphetamine."[8]  The ALJ also relied on the May 2018 letter from plaintiff's drug counselor, which stated that plaintiff is still being treated for chronic opioid dependence.  (Tr. at 21, citing Tr. at 590.)  That plaintiff continued to receive <u>treatment</u> for drug abuse does not mean he continued to <u>abuse drugs</u>.  Indeed, the counselor wrote that plaintiff "continues to demonstrate abstinence from all illicit and non-prescribed drug use." (Tr. at 590.)

As the Seventh Circuit has noted, "[n]ot all of the ALJ's reasons must be valid as long as <u>enough</u> of them are." <u>Halsell v. Astrue</u>, 357 Fed. Appx. 717, 722 (7th Cir. 2009).  However, because the decision must be reversed on the CPP issue discussed above, and because the record does contain some conflicting evidence as to how well plaintiff's seizures were controlled even when he complied with medication, I will remand on the credibility issue as well.

## IV.  CONCLUSION

Plaintiff asks that the court direct the Commissioner to find him disabled; in the alternative, he asks that the matter be remanded for further proceedings.  "[A]n award of benefits is appropriate only if all factual issues have been resolved and the record supports a finding of disability." <u>Briscoe v. Barnhart</u>, 425 F.3d 345, 356 (7th Cir. 2005); <u>see also</u> <u>Kaminski v. Berryhill</u>, 894 F.3d 870, 875 (7th Cir. 2018) ("When a reviewing court remands to the Appeals Council, the ordinary remedy is a new hearing before an administrative law judge."), <u>amended</u>, 2018 U.S. App. LEXIS 24814 (7th Cir. Aug. 30, 2018).  Plaintiff makes no effort to meet the demanding standard for a judicial award, and the errors identified above are properly addressed by remand for further consideration and findings. <u>See, e.g.</u>, <u>Sheldon v. Colvin</u>, No. 13-C-1219, 2014 U.S. Dist. LEXIS 155788, at *37-38 (E.D. Wis. Nov. 4, 2014).

---

[8]https://www.healthline.com/health/adhd/adderall-effects-on-body#2.

**THEREFORE, IT IS ORDERED** that the ALJ's decision is reversed, and the matter is remanded for further proceedings consistent with this decision pursuant to 42 U.S.C. § 405(g), sentence four. The Clerk is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 7th day of April, 2020.

/s Lynn Adelman
LYNN ADELMAN
District Judge